COURT OF APPEALS OF VIRGINIA

Present:  Chief Judge Huff, Judge Humphreys and Senior Judge Bumgardner
Argued at Salem, Virginia

MYRON LAMAR RHODES

MEMORANDUM OPINION* BY
v.      Record No. 2221-14-3          JUDGE RUDOLPH BUMGARDNER, III
                                        NOVEMBER 3, 2015

HARRISONBURG ROCKINGHAM
 SOCIAL SERVICES DISTRICT

FROM THE CIRCUIT COURT OF ROCKINGHAM COUNTY
Bruce D. Albertson, Judge

Tania L. Perez Rodriguez (John Elledge & Assoc., PC, on brief), for
appellant.

Kim Van Horn Gutterman, Assistant County Attorney, for appellee.

Danita S. Alt, Guardian *ad litem* for the minor child.

Myron L. Rhodes appeals a protective order entered pursuant to a petition brought by

Harrisonburg Rockingham Social Services District for the benefit of his daughter B.R.  He

maintains there was insufficient evidence that the child was abused or neglected or that there was

need for a protective order and supervised visitation.  Finding no error, we affirm.

We view the evidence in the light most favorable to the prevailing party below and grant

to it all reasonable inferences fairly deducible therefrom.  See Logan v. Fairfax Cnty. Dep't of

Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991).  Myron Rhodes and Megan

Schaefer were married for eighteen years and had four children; three girls age 17, 16, 12, and a

son age 6.  In 2013, the parties separated and became embroiled in a contested divorce.  During the

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

litigation, the three girls stayed with the father and the youngest child remained with the mother. Custody of the youngest daughter, B.R., became the focus of their litigation.

As a part of the divorce proceeding on December 27, 2013, the circuit court granted primary physical custody of B.R. to the mother and set the transfer of custody for January 3, 2014. Transfer did not happen. The father refused to assist with the initial custody transfer. B.R. ran away and hid in the woods to avoid going with her mother. Police found her "buried in the snow" in the woods behind a friend's house. They had to carry her out of the woods.

The next day, the mother again tried to coordinate the custody exchange with the father but to no avail. The parties went back to court which set another transfer for January 12, 2014. Approximately fifteen minutes after B.R. went home with her mother, she ran away. She was found after a four-hour police search. B.R. stayed with her father that night. He then took her to the hospital and told medical personnel that the mother had "roughed her up."

On January 13, 2014, a deputy sheriff accompanied the mother to the father's house to pick up B.R. B.R. told the deputy sheriff that she would rather go to juvenile detention than go with her mother. The deputy took her to juvenile intake and then transported her to the hospital for a psychiatric evaluation. When her mother arrived at the hospital, B.R. refused to go with her and left with a family friend with whom she stayed for a few days.

On January 15, 2014, the mother again tried to take B.R. to her house. The father sent a message to the mother that B.R. ran away again. After a search by police, B.R. was found at a nearby friend's house. B.R. was taken to the hospital and subsequently stayed two weeks in the Commonwealth Center for Children and Adolescents. She refused to speak with her mother during that stay. When B.R. left the Commonwealth Center, she stayed for several months with a family the parties knew from church. She was then placed with a cousin of her father.

The Harrisonburg Rockingham Social Services District became involved when B.R. went to the Commonwealth Center. It filed a petition in the juvenile and domestic relations district court which alleged B.R. was an abused and neglected child and which sought a protective order.

The J&DR court found that the father abused and neglected B.R. It entered a protective order which prohibited contact between B.R. and her father and older siblings. The father appealed that decision to the circuit court which heard evidence and argument on June 26 and August 28, 2014. On August 28, 2014, the circuit court entered an adjudicatory order finding that the father "creates or inflicts . . . upon such child [B.R.] a . . . mental injury by other than accidental means, or creates a substantial risk of death, disfigurement or impairment of bodily or mental functions."

The circuit court conducted a dispositional hearing on September 25, 2014, during which it heard further evidence and argument. It then entered a child protective order against the father. It decreed that the mother would continue to have custody of B.R. with the father having supervised visitation. This appeal followed in which the father maintains there is insufficient evidence to support a finding that B.R. was abused or neglected by him. He also maintains that there was insufficient evidence that he created or inflicted her mental injury of parental alienation.

"In matters of custody, visitation, and related child care issues, the court's paramount concern is always the best interests of the child." Farley v. Farley, 9 Va. App. 326, 327-28, 387 S.E.2d 794, 795 (1990). "Where, as here, the court hears the evidence ore tenus, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." Martin v. Pittsylvania Cnty. Dep't of Soc. Servs., 3 Va. App. 15, 20, 348 S.E.2d 13, 16 (1986) (citation omitted). "Where the record contains credible evidence in support of the findings made by that court, we may not retry the facts or substitute our view of the facts for those of the trial court." Ferguson v. Stafford Cnty. Dep't of Soc. Servs., 14 Va. App. 333, 336, 417 S.E.2d 1, 2 (1992).

Between February and April, 2014, Tamala Gilardi, a licensed clinical social worker, provided services and supervised visitation for the family. She facilitated one visitation between B.R. and her mother. B.R. told Gilardi that she did not want to live with her mother, but could not articulate anything negative that her mother had done to her, other than divorcing her father. B.R. said to avoid living with her mother that she "was willing to go a residential facility for children that were emotional [sic] disturbed, that she was willing to run away, that she was willing to harm herself, that she was willing to stay in a foster care system until she was eighteen years of age." Gilardi opined that B.R. "was influenced by the need to be with her father and to align with her father."

Beginning in January 2014, Monica Johns, a licensed professional counselor, counseled B.R. Johns testified that B.R. was receiving "misinformation" from her father about her mother. She believed B.R. was alienated from her mother and that the alienation was caused by her father's "hostile and aggressive parenting." She testified that "due to the significant levels of the parental alienation that she's [B.R.] experiencing," there was no other explanation for B.R.'s feelings toward the mother, other than parental alienation. Johns explained that in the long term, children who have been the subject of parental alienation can experience depression, anxiety, anger management issues, coping mechanisms, and attachment issues. Johns recommended that B.R. continue to live in a "neutral" household and have "therapeutic supervised" visitation with the father and the mother.

Code § 16.1-228(1) defines an abused or neglected child as one:

> [w]hose parents . . . creates or inflicts, . . . upon such child a . . .
> mental injury by other than accidental means, or creates a
> substantial risk of death, disfigurement or impairment of bodily or
> mental functions . . . .

The Department maintained that the father's hostile and aggressive parenting was parental alienation, and his actions negatively impacted B.R.'s relationship with her mother. Expert testimony explained how the father's actions and his behavior affected the child. The

- 4 -

father expressed anger toward the mother in front of the children. He talked negatively about her and told the children inaccurate or one-sided accounts of what was happening in the divorce. He refused to cooperate and work with the mother in scheduling and co-parenting issues. The father was uncooperative with the professionals involved in the matter. Throughout the proceedings, B.R. refused to live with the mother. She ran away from home to avoid living with her mother and stated that she would rather live in foster care. The counselors noted that the father did little to encourage her relationship with her mother.

The Department's expert further testified that there are long term mental health effects for a child who has been subject to parental alienation. The child can experience depression, anxiety, attachment issues, anger management issues, developmental delays, and poor coping mechanisms. In B.R.'s case, she was "quickly learning that she can do what she wants to do when she wants to do it" and does not have to listen to people of authority. She also was "spending a lot of her emotional energy" on the conflict with her mother, as opposed to doing typical things that a young girl does.

The trial court had the opportunity to see and hear the witnesses. It found the Department's mental health experts to be credible when they testified that B.R.'s mental health was being compromised by father's statements and actions. The trial court found that the father engaged in "brinksmanship" and used B.R. "as some chess piece in a game." The trial court stated that B.R. is "acting in accordance with the same sort of attitude [the father does] in the case, which is she is taking it to the brink." The trial court expressed concern about B.R.'s mental health as a result of the father' actions. It did not err in finding that the father abused or neglected B.R.

The father maintains that the trial court erred by entering a protective order and ordering supervised visitation with B.R. The father argues that the evidence was insufficient to prove that

B.R.'s behavior toward her mother could be attributed to him. He contends he did not intentionally alienate B.R. and sought to have an amicable divorce.

In this case, the trial court determined that B.R. was in need of protection. Despite months of counseling, the father continued to discourage B.R.'s relationship with her mother. The father would not cooperate with the social workers and counselors. He refused to encourage the older children to participate in therapy with the mother and B.R. The social worker testified that the father

> does not seem to understand the amount of power and control he and his daughters have over [B.R.]. And, and because of that is why the supervision is needed because if a minute hair of it is used in the wrong way, [we] will backslide completely to where we were, which we've barely made any progress. So backwards is not an option.

The Department noted that even at the disposition hearing on September 25, 2014, B.R. was still alienated from her mother despite the counseling services put in place. Likewise, the father was still refusing to cooperate with the professionals.

The trial court saw and heard the witnesses and found the Department's witnesses more credible. It clearly found that the father was not a credible witness and weighed his testimony accordingly. "The credibility of the witnesses and the weight accorded the evidence are matters solely for the fact finder who has the opportunity to see and hear that evidence as it is presented." Sandoval v. Commonwealth, 20 Va. App. 133, 138, 455 S.E.2d 730, 732 (1995). The evidence was sufficient to support its finding that B.R.'s behavior was caused by the father's actions.

The trial court did not err in entering the protective order and in ordering supervised visitation. Accordingly, we affirm.

Affirmed.